515 F.2d 1355
 169 U.S.App.D.C. 384
 NORTH NEW YORK SAVINGS BANK
v.
FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION, Appellant.
NORTH NEW YORK SAVINGS BANK, Appellant,
v.
FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION.
 Nos. 74-1509, 74-1993.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 26, 1975.
Decided July 21, 1975.
 
 Lawrence W. Hayes, Asst. Gen. Counsel, Federal Savings and Loan Ins. Corp., Washington, D. C., of the bar of the Supreme Judicial Court of Massachusetts pro hac vice, by special leave of court, with whom Daniel J. Goldberg, Associate Gen. Counsel, and Paul E. McGraw, Deputy Gen. Counsel, Federal Savings and Loan Ins. Corp., Washington, D. C., were on the brief for appellant in No. 74-1509 and appellee in No. 74-1993.
 Anthony J. McMahon, Washington, D. C., for appellant in No. 74-1993 and appellee in No. 74-1509.
 Before TAMM and LEVENTHAL, Circuit Judges, and MILLER,* Judge, United States Court of Customs and Patent Appeals.
 Opinion for the Court filed by Judge MILLER.
 MILLER, Judge:
 
 
 1
 This is an appeal from the order of the district court, 369 F.Supp. 1128 (D.D.C. 1974): (1) granting a motion for summary judgment by defendant, Federal Savings and Loan Insurance Corporation (FSLIC), with respect to the claim of plaintiff, North New York Savings Bank (North New York), for credit of the "unearned" portion of an insurance premium paid FSLIC in 1971; and (2) granting North New York's motion for summary judgment on its claim for interest on its pro rata share of the Secondary Reserve of FSLIC for that part of calendar year 1971 during which the share was held by FSLIC. We affirm the judgment on (1) and reverse the judgment on (2) in part.
 
 BACKGROUND OF THE CASE
 
 2
 The parties have stipulated all material facts. Prior to October 1, 1971, North New York was a savings and loan association known as North New York Savings and Loan Association (NNYS&L), the accounts of which were insured by FSLIC under 12 U.S.C. § 1726. On May 13, 1971, NNYS&L paid its regular annual premium to FSLIC's Primary Reserve for the year ending May 12, 1972, in accordance with 12 U.S.C. §§ 1727(a), (b). Pursuant to 12 U.S.C. § 1727(g), that premium ($65,787.49) was paid from NNYS&L's pro rata share of the Secondary Reserve as of January 1, 1971 ($660,642.10), leaving a balance of $594,854.61.
 
 
 3
 NNYS&L's president wrote the Board's Supervisory Agent in New York on September 16, 1971, informing the Board of NNYS&L's scheduled conversion to a mutual savings bank on October 1, 1971, and of approval by the Federal Deposit Insurance Corporation (FDIC) of its application for insurance. The letter also requested (1) a refund of its pro rata share of the Secondary Reserve ($594,854.61), (2) accrued interest thereon from January 1, 1971, and (3) a refund of the "unused" portion of the premium paid to FSLIC's Primary Reserve, i.e., for the period October 1, 1971, to May 12, 1972. The Board's Supervisory Agent replied, advising that after the conversion was completed and proof thereof submitted, the request would be forwarded to Washington.
 
 
 4
 Conversion of NNYS&L to North New York occurred on October 1, 1971, at which time its accounts became insured by FDIC pursuant to 12 U.S.C. § 1811 et seq., coverage by FSLIC having terminated the day before. Proof of conversion and NNYS&L's requests were forwarded to Washington in a letter dated October 15, 1971, from the Board's Supervisory Agent, who stated that North New York had requested that the refund of the pro rata share of the Secondary Reserve be made "after the annual credit of income (interest) thereon." In a letter dated November 15, 1971, North New York's president reminded the Supervisory Agent of its request for a refund of its pro rata share of the Secondary Reserve ($594,854.61), accrued interest thereon, and the "unearned" premium paid to FSLIC's Primary Reserve.
 
 
 5
 On November 30, 1971, the Board directed the Treasurer of FSLIC to pay North New York its pro rata share of the Secondary Reserve; and prior to December 21, 1971, North New York received a check dated December 13, 1971, in the amount of $594,854.61, representing its pro rata share of the Secondary Reserve. However, there was no response to its request for accrued interest thereon and for refund of the "unearned" premium. North New York received a standard notice dated December 15, 1971, which was sent to all insured institutions, stating that the interest rate for the institutions' pro rata shares of the Secondary Reserve had been established at 5.537954 percent. Shortly thereafter, North New York received an Annual History Statement advising that its accrued interest as of December 31, 1971, on its pro rata share of the Secondary Reserve would be $34,270.32.[2]
 
 
 6
 On December 21, 1971, North New York wrote the Board chairman requesting (1) interest on its pro rata share of the Secondary Reserve from January 1, 1971, until December 13, 1971 ($32,630.16), and (2) a refund of the "unearned" premium paid to FSLIC's Primary Reserve for the period October 1, 1971, to May 12, 1972 ($40,373.76) during which its accounts were insured by FDIC. These requests were subsequently denied on February 9, 1972. Following a formal petition to the Board on February 1, 1973, North New York's requests were again denied on April 18, 1973. In the petition North New York rescinded its request for refund and asked that FSLIC be directed to transfer to the FDIC an amount equal to the "unearned" premium to be credited to its account with the FDIC.
 
 
 7
 North New York filed for declaratory judgment on July 10, 1973, seeking interest on its pro rata share of the Secondary Reserve and a credit on its behalf with the FDIC of the "unearned" premium paid on May 13, 1971, to FSLIC's Primary Reserve. On cross-motions for summary judgment, the trial judge denied North New York's claim for the credit but granted its claim for interest on its pro rata share of the Secondary Reserve. Cross-appeals were filed, FSLIC appealing from the granting of interest and North New York appealing from the denial of the credit. The trial judge based his denial of the credit on Euclid National Bank v. Federal Home Loan Bank Board, 286 F.Supp. 125 (N.D.Ohio 1966), aff'd 396 F.2d 950 (6th Cir. 1968), cert. denied, 393 U.S. 846, 89 S.Ct. 130, 21 L.Ed.2d 116 (1968). In granting the interest on North New York's pro rata share of the Secondary Reserve, the trial judge held that 12 U.S.C. § 1727(f) most directly governed the termination of North New York's status with FSLIC, that 12 U.S.C. § 1727(e) provides for interest on monies in the Secondary Reserve but concerns the interest computation procedure rather than the question of interest in the event an insured withdraws before the end of the calendar year, and that nothing in the statutory language or legislative history supports a denial of interest.
 
 OPINION
 The claim for credit of "unearned" premium
 
 8
 North New York's claim for credit of the "unearned" portion of the premium paid to FSLIC's Primary Reserve for the period from date of conversion on October 1, 1971, to May 12, 1972, is not based on any statute, regulation, or case law, or on the theory of unjust enrichment. The most relevant statute is 12 U.S.C. § 1727(b)(1), which governs payment of the premium and reads as follows:
 
 
 9
 Each institution whose application for insurance is approved by the Corporation (FSLIC) shall pay to the Corporation, in such manner as it shall prescribe, a premium for such insurance equal to one-twelfth of 1 per centum of the total amount of all accounts of the insured members of such institution. Such premium shall be paid at the time the certificate is issued by the Corporation under section 1726 of this title, and thereafter annually, except that under regulations prescribed by the Corporation such premium may be paid semiannually.[3]
 
 
 10
 In rejecting this claim, the trial judge relied on Euclid, supra, stating that it is "a case based on substantially identical facts as the case here." The essential reason[4] relied upon by both the district court and the Sixth Circuit in Euclid in rejecting the claim was "the ordinary rule . . . that an insured may not have any part of his premium returned once the risk attaches, even if it eventually turns out that the premium was in part unearned, unless there is an agreement to that effect." Fleetwood Acres, Inc. v. Federal Housing Administration, 171 F.2d 440, 442 (2nd Cir. 1948).
 
 
 11
 North New York does not challenge the "ordinary rule" but argues that it is not applicable here.[5] One of its arguments is that "FSLIC controls the maturity of its obligation to a degree not shared . . . by traditional insurance companies which protect against . . . spontaneous and uncontrollable occurrences." However, after extensive argument, North New York seems to recognize that FSLIC is subject to some "uncontrollable" defaults under 12 U.S.C. §§ 1724(d), 1728(b), even though it has certain powers to control the timing of a default and to prevent a default. Thus, FSLIC suffers "to a degree" the same lack of individual predictability of insured events as do traditional insurance companies. Other arguments, such as a fixed instead of variable premium, insurance of the customers' accounts rather than of the institutions themselves, and presence of a public purpose, are not persuasive that the "ordinary rule" is inapplicable to FSLIC considering the numerous uses of "insurance," "insured," "insure," "reserves," and "premium" in chapter 13, subchapter IV of title 12, United States Code, and its overall statutory scheme. 12 U.S.C. § 1724 et seq.
 
 
 12
 North New York further argues that the premium and risk are apportioned over the entire year as evidenced by FSLIC's annual reports to Congress listing "unearned insurance premiums" as a liability and by insurance regulation 12 C.F.R. § 563.16 (1974),[6] which provides for a credit upon future premiums of the "unearned" portion of any premium of an insured institution absorbed by merger, consolidation, or purchase of bulk assets. However, designating a portion of a premium to be "unearned" for accounting purposes does not, as a matter of law, make the premium and risk apportionable; and the "ordinary rule" precludes return of that portion "even if it eventually turns out that the premium was in part unearned." Nor does 12 C.F.R. § 563.16 (1974) establish apportionability in view of the additional premium required of the acquiring institution with respect to transferred accounts which are to remain insured with the FSLIC.
 
 
 13
 With respect to appellant's request for a credit with FDIC, this was directly answered by the district court in Euclid as follows:
 
 
 14
 Neither by statute nor by regulation is there provision or authority for crediting of insurance premiums by and between these two wholly separate governmental insuring agencies.
 
 
 15
 Although FSLIC was created to enable savings and loan associations to have their depositors' accounts insured in a manner similar to those of banks through FDIC, Congress established "two wholly separate governmental insuring agencies" financed by assessments on different member institutions. Compare 12 U.S.C. § 1811 with 12 U.S.C. § 1725.
 
 
 16
 In view of the foregoing, we hold that North New York is not entitled to a refund or credit for a portion of its annual premium paid to FSLIC's Primary Reserve on May 13, 1971.
 
 
 17
 The issue of interest on the pro rata share of the Secondary Reserve
 
 
 18
 Under the following provisions of 12 U.S.C. §§ 1727(e), (f) in effect at the time of the conversion, it is undisputed that the pro rata shares in the Secondary Reserve earn interest and that such shares are to be returned when institutions terminate their relationship with FSLIC:
 
 
 19
 (e) Credits to Secondary Reserve; availability for losses; assignment or transfer of share of Reserve.
 
 
 20
 The Corporation, in accordance with such regulations as it may prescribe, shall credit to the Secondary Reserve, as of the close of each calendar year a return on the outstanding balances of the Secondary Reserve during such calendar year, as determined by the Corporation, at a rate equal to the average annual rate of return to the Corporation during the year ending at the close of November 30 of such calendar year, as determined by the Corporation, on the investments held by the Corporation in obligations of, or guaranteed as to principal and interest by, the United States. Except as provided in subsections (f) and (g) of this section, the Secondary Reserve shall be available to the Corporation only for losses of the Corporation and shall be so available only to such extent as other accounts of the Corporation which are available therefor are insufficient for such losses. No right, title, or interest of any institution in or with respect to its pro rata share of the Secondary Reserve shall be assignable or transferable, whether be (sic) operation of law or otherwise, except to such extent as the Corporation may by regulation or otherwise provide for transfer of such pro rata share in cases of merger or consolidation transfer of bulk assets as defined by the Corporation by regulation or otherwise for the purposes of this sentence, and similar transactions as so defined.
 
 
 21
 (f) Cessation of prepayments; distribution of share of Secondary Reserve; reinstatement of reserve share; payment; waiver, or other treat (sic) of accruals.
 
 
 22
 If (i) the status of an insured institution as an insured institution is terminated pursuant to any provision of section 1730 of this title or the insurance of accounts of an insured institution is otherwise terminated, (ii) a conservator, receiver, or other legal custodian is appointed for an insured institution under the circumstances and for the purpose set forth in subsection (d) of section 1724 of this title, or (iii) the Corporation makes a determination that for the purposes of this subsection an insured institution has gone into liquidation, the obligation of such institution to make prepayments under subsection (d) of this section, including any prepayments as to which such institution is obligated at the time of such termination, appointment, or determination, shall cease, and the Corporation shall pay in cash to such institution its pro rata share of the Secondary Reserve, in accordance with such terms and conditions as the Corporation may prescribe by regulations or otherwise, or, at the option of the Corporation, the Corporation may apply the whole or any part of the amount which would otherwise be paid in cash toward the payment of any indebtedness or obligation, whether matured or not, of such institution to the Corporation, then existing or arising before such payment in cash: Provided, That such payment or such application need not be made to the extent that the provisions of the exception in the last sentence of subsection (e) of this section are applicable. The Corporation in its discretion may provide by regulations or otherwise for the reinstatement in whole or in part, upon such terms and conditions as to payment or otherwise as it may prescribe, of the pro rata share of an institution in the Secondary Reserve in the event that such status or such insurance is restored by action of the Corporation or of a court in reversing or setting aside such termination, or in the event that, after such appointment or such determination, an institution is restored to operation as an insured institution, and for the payment, waiver, or other treatment in whole or in part of any prepayments which, in the absence of the first sentence of this subsection, would have accrued under subsection (d) of this section or would be payable thereunder.
 
 
 23
 The trial judge said that this issue involved a question of Congressional intent, since no precise case or statute controlled, stating:
 
 
 24
 The (FSLIC) would, however, deny (North New York) any interest on its share for 1971 because (North New York) withdrew from the FSLIC before the end of the calendar year. The Court finds nothing in the statutory language or legislative history to support such a denial. . . . The section on which (FSLIC) relies to support its denial of interest, section 1727(e), addresses the procedure to be followed in computing the annual interest and crediting it to the Secondary Reserve. It is silent on the question of interest in the event an insured withdraws before the end of the calendar year; (s)ection 1727(e) is not directed at procedures for withdrawal of members' pro rata shares. This subject is dealt with in the next section, section 1727(f), and here it is simply stated that the FSLIC shall pay institutions such as (North New York) their "pro rata share of the Secondary Reserve" and no restrictions are placed on this entitlement to the pro rata share.
 
 
 25
 We are persuaded that the trial judge erred as a matter of law when he based his determination of this issue on a finding that there is "nothing in the statutory language . . . to support such a denial" of interest on pro rata shares removed before the end of the calendar year.[7] The statute does, indeed, address the procedure for computing interest, but it also plainly provides a specific limitation with respect to the crediting of interest, thus:
 
 
 26
 The (FSLIC) . . . shall credit to the Secondary Reserve, as of the close of each calendar year a return on the outstanding (average) balances of the Secondary Reserve during such calendar year, as determined by the (FSLIC), at a rate equal to the average annual rate of return to the (FSLIC) during the (fiscal) year ending at the close of November 30 of such calendar year . . .. (Emphasis supplied.)
 
 
 27
 Not until December 31 of each year can FSLIC credit the pro rata shares of the Secondary Reserve; and then only the outstanding balances during the year are to be credited at the average annual rate of return determined as of November 30.[8]
 
 
 28
 The trial judge characterized 12 U.S.C. § 1727(e) as "silent on the question of interest in the event an insured withdraws before the end of the calendar year" and observed that 12 U.S.C. § 1727(f) places "no restrictions" on an institution's entitlement to its pro rata share of the Secondary Reserve. Although subsection (f) represents a mandate to FSLIC to "pay in cash to such (terminated) institution its pro rata share of the Secondary Reserve," it, too, is silent on the question of interest. Moreover, we are satisfied that there is nothing unusual about requiring a policyholder to retain its status as of a certain date in order to share in the earnings of an insurance company's reserves. See 43 Am.Jur.2d Insurance § 121; Couch, supra, § 34:132.
 
 
 29
 North New York argues that regulation 12 C.F.R. § 563.16-2 (1971),[9] which provided for a return ("as of the close of each calendar year") on the outstanding balances of the Secondary Reserve of both a merged and surviving institution, "unlawfully discriminates" against institutions like it and that "Congress did not intend" such discrimination. However, this overlooks the fact that Congress itself provided for the merger exception in 12 U.S.C. § 1727(e) and for the specific authority in FSLIC to adopt regulations implementing that exception. Moreover, a distinction between a merging institution and a terminating institution is not unreasonable since the merging institution's accounts continue to be insured by FSLIC.
 
 
 30
 That North New York and its predecessor had a property interest in their pro rata share of the Secondary Reserve is "fully admitted" by FSLIC. See also Commissioner v. Lincoln Savings & Loan Assn., 403 U.S. 345, 355, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971). However, this does not remove the specific limitation in 12 U.S.C. §§ 1727(e), (f) with respect to the crediting of interest, much as an ordinary depositor must comply with an institution's requirements for the earning of interest.
 
 
 31
 Mindful of the general rule that the United States is not liable for interest on claims against it in the absence of statute or contract,[11] we are satisfied that the rule is not applicable to this situation. Congress provided that the pro rata shares of the Secondary Reserve earn interest at the FSLIC-determined rate (5.537954 percent for 1971). From October 1 through December 13, 1971, FSLIC held North New York's pro rata share and presumably earned interest thereon at that rate. FSLIC is a separate corporate body, invested with powers, duties, and responsibilities which, in the judgment of Congress, require that it have the power to sue and be sued under 12 U.S.C. § 1725(c)(4);[12] also, FSLIC is in the insurance business and is assumed to have accepted the ordinary incidents of suits in such business.[13]
 
 
 32
 In view of the foregoing, we hold that North New York is entitled to interest at the rate of 5.537954 percent on its pro rata share of $594,854.61, but only for the period October 1 through December 13, 1971.
 
 
 33
 The judgment of the district court granting FSLIC's motion for summary judgment with respect to North New York's claim for credit of the "unearned" portion of the insurance premium is affirmed; and the court's judgment granting North New York's motion for summary judgment on its claim for interest on its pro rata share of the Secondary Reserve is reversed except with respect to the allowance of interest for the period October 1 through December 13, 1971.[14]
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 293(a)
 LIC is an independent corporate instrumentality and agency of the United States operating under the direction and control of the Federal Home Loan Bank Board (Board), which is an independent agency of the United States. 12 U.S.C. §§ 1437(b), 1725(a), (c), 1730(k)(1). Institutions which have their customers' savings accounts insured by FSLIC must pay an annual insurance premium to FSLIC's Primary Reserve on the anniversary date of the certificate issued by FSLIC showing the institution has become insured. 12 U.S.C. §§ 1726(c), 1727(a), (b). From January 1, 1962, until August 16, 1973, an insured institution was also required to pay an "additional premium" in the nature of a prepayment with respect to future premiums, such additional premiums being credited to the Secondary Reserve of FSLIC. 12 U.S.C. § 1727(d)(1) (1970).[1] The Primary and Secondary Reserves have been created to meet potential losses of FSLIC, which pays individual account holders in the event of a default by an insured institution and makes loans or contributions to an insured institution to prevent its default or, if in default, to restore it to normal operation as an insured institution. 12 U.S.C. §§ 1724(b), (c), 1727(a), (e), 1728(b), 1729(f). Under the provisions of 12 U.S.C. § 1727(e), FSLIC must credit to the Secondary Reserve, as of the close of each calendar year, a return (interest) on an insured institution's pro rata share of the Secondary Reserve during such calendar year. The rate of return equals the average annual rate of return to FSLIC on investments in obligations of (or guaranteed by) the United States computed for the fiscal year ending November 30 within such calendar year. Under certain circumstances, an insured institution may use its pro rata share of the Secondary Reserve to discharge its obligation to pay its annual insurance premium to the Primary Reserve. 12 U.S.C. § 1727(g). If its status as an insured institution is terminated, FSLIC must pay such institution its pro rata share of the Secondary Reserve in cash or apply such amount in whole or in part to any indebtedness of such institution to FSLIC. 12 U.S.C. § 1727(f).
 
 
 [1]
 The Act of August 16, 1973, Pub.L.No.93-100, § 6, 87 Stat. 344, eliminated this requirement
 
 
 [2]
 This apparently represents interest computed at 5.537954 percent on the returned pro rata share ($594,854.61) for the complete calendar year ($32,942.77) and interest at the same rate on the deducted annual premium ($65,787.49) for January 1 through May 13, 1971 ($1,327.55)
 
 
 [3]
 FSLIC has apparently not elected to provide for semiannual premium payment. See 12 C.F.R. § 563.15 (1971 and 1974). This regulation provides that the premium shall be determined from the latest report of the insured institution filed with FSLIC. Determination of the premium at one point in time even though new accounts and deposits are insured underscores the difficulty in determining what, if any, premium is "unearned" and supports application of the "ordinary" rule to FSLIC. See note 5, infra
 
 
 [4]
 The trial judge in Euclid relied on other reasons to justify his holding, and North New York attacks these as erroneous. However, it is unnecessary to reach them since the precedential value of Euclid clearly stands or falls according to applicability of the "ordinary rule" to FSLIC
 
 
 [5]
 The "ordinary rule" must not only yield to any contractual exceptions but also to statutory provisions. 44 C.J.S. Insurance § 406; 43 Am.Jur.2d Insurance § 629; Couch on Insurance 2d § 34:9, citing, among others, Fleetwood, supra, and stating:
 This rule is based upon just and equitable principles, for the insurer has, by taking upon himself the peril, become entitled to the premium, and, although the rule may result in profit to the insurer, it is but a just compensation for the dangers or perils assumed; besides, the danger incurred may be greater in any one moment than during the entire remaining period of insurance, and it would be extremely difficult, to say the least, fairly to apportion the premium. (Footnote omitted.)
 However, we note that statutory and contractual exceptions are so prevalent that the instant case appears to involve one of the few situations where the rule is applicable. One might question just how "ordinary" the "ordinary rule" is. Couch on Insurance 2d § 34:29; 43 Am.Jur.2d Insurance § 633.
 
 
 [6]
 In the event of the purchase of bulk assets by an insured institution or of the absorption by an insured institution of another institution through merger or consolidation and the issuance of accounts of an insurable type in connection therewith, such insured institution will be billed for an additional premium based upon the aggregate of the increase of its accounts of an insurable type issued in connection with such transaction. Such premium shall be computed at the rate prescribed by law and shall be that proportion of the amount so computed which the unexpired portion of such insured institution's insurance year bears to its entire insurance year. For the purpose of computing such additional premium and as the basis for such computation, such merger, consolidation, or purchase of bulk assets shall be deemed completed upon the last day of the month in which the Board grants its approval, or upon such other date as the Board shall prescribe: Privided, (sic) however, That if the institution which is absorbed by such insured institution by such merger, consolidation, or purchase of bulk assets is an insured institution, the insured institution which has so absorbed such other insured institution shall receive a credit upon its future premiums of the unearned portion of any premium of such absorbed institution to the extent that the same has been paid, and the unearned portion of any premium of such absorbed institution shall, to the extent the same has not been paid, be canceled
 
 
 [7]
 With regard to legislative history of the Secondary Reserve, we note the following statement of the chairman of the legislative committee of the United States Savings & Loan League, accompanied by the legislative director and counsel, in Hearings on H.R. 7108 and 7109 Before Subcomm. No. 1 of the House Comm. on Banking and Currency, 87th Cong., 1st Sess. 39-40 (1961):
 We note that the earnings on prepayments would not be paid in cash, but would be credited to the secondary reserve. If this credit were made to the individual prepayments, thus reducing each association's required prepayment the following year, it would, of course, realize an immediate return on the association's investment.
 If this is not so, the associations will be denied any return for their prepayment premiums such as they now receive from their Federal home loan bank stock.
 I must say that the industry in originating this legislation was always under the impression that inasmuch as the Corporation would be earning on the prepaid premiums that these earnings would be paid to the associations.
 We thought that the earnings would, at least, be as high as the dividends we now receive in our Federal home loan bank stock.
 We would be glad to supply an appropriate amendment to implement this change if after further study it appears necessary.
 However, shortly thereafter the legislative director submitted a letter stating (id. at 64):
 We have reviewed this question and have discussed it with the staff of the Federal Home Loan Bank Board and we are satisfied that the present language is adequate to achieve our objective. Therefore, it is not necessary for us to submit an amendment.
 Such comments relating to the section of H.R. 7108 that added 12 U.S.C. § 1727(d) through (g) were concerned with a credit for earnings which would reduce an association's prepayment the following year not with the consequences under subsection (e) of termination of an institution's status with FSLIC before the close of a calendar year.
 
 
 [8]
 FSLIC's computation of interest on that portion ($65,787.49) of NNYS& L's pro rata share of the Secondary Reserve between January 1, 1971, through May 13, 1971 (note 2, supra), when said portion was used to pay the annual premium through a credit in that amount to the Primary Reserve pursuant to 12 U.S.C. § 1727(g), and the regulation, 12 C.F.R. § 563.16-2 (1974), adopted pursuant to Pub.L.No.93-100, § 6, 87 Stat. 344 (1973), providing for an apportioned rate of return on exhausted pro rata shares of the Secondary Reserve are entirely consistent with the clear requirement of 12 U.S.C. § 1727(e) to credit "the outstanding (average) balances of the Secondary Reserve during" the calendar year "as of the close of each calendar year." (Emphasis supplied.)
 
 
 [9]
 The amounts of the premium prepayments made by insured institutions shall be credited to the Secondary Reserve. The Corporation shall maintain records showing each insured institution's pro rata share of the Secondary Reserve. The Corporation shall credit to the Secondary Reserve, as of the close of each calendar year, a return on the outstanding balances of the Secondary Reserve during such calendar year, as determined by the Corporation in accordance with subsection (e) of section 404 of the National Housing Act, as amended. Except as provided in the next following sentence or by action of the Corporation pursuant to the last sentence of said subsection (e), no right, title, or interest of any institution in or with respect to its pro rata share of the Secondary Reserve shall be assignable or transferable, whether by operation of law or otherwise. In the event that an insured institution (hereinafter in this sentence called the merging institution) is merged into another insured institution (hereinafter in this sentence called the surviving institution), the merging institution's pro rata share of the Secondary Reserve shall automatically be transferred to the surviving institution, and in such event the amount of the increase in all accounts of the surviving institution's insured members as of the December 31 next following such merger shall, for premium prepayment purposes, be adjusted by the Corporation so that such increase shall not include the accounts of insured members of the merging institution as of the close of the immediately preceding December 31
 LIC's admission of North New York's property interest does, however, constitute a basis for affirming the district court's allowance of North New York's claim for interest for that part of calendar year 1971 during which its share in the Secondary Reserve was held by FSLIC extending from October 1, (date of conversion) through December 13, 1971 (date of FSLIC's check). That the period of delay in payment by FSLIC to North New York from October 1 to December 13, 1971, might be considered "routine" for administrative processing does not overcome the trial judge's finding that "Plaintiff's share was held by the FSLIC through November 30, 1971 and not refunded until December 13, 1971." On October 1, 1971, North New York's predecessor ceased to be an insured institution, and, pursuant to 12 U.S.C. § 1727(f), FSLIC was required to pay out its pro rata share of the Secondary Reserve.[10] NNYS&L's letter of September 16, 1971, advised the Board's Supervisory Agent of its scheduled conversion to a bank on October 1 and of approval of insurance by FDIC. Nevertheless, the Agent's response was to wait until after conversion was completed before any refund requests would be forwarded to the Board's headquarters in Washington.
 
 
 [10]
 Subsection (f) permitted FSLIC to adopt certain regulations with respect to such payment, but there were none in 1971
 
 
 [11]
 Gould v. United States, 112 U.S.App.D.C. 233, 301 F.2d 557 (1962); Whittier v. Emmet, 108 U.S.App.D.C. 191, 281 F.2d 24 (1960), cert. denied, 364 U.S. 935, 81 S.Ct. 380, 5 L.Ed.2d 367 (1961); 77 Am.Jur.2d United States § 91
 
 
 [12]
 See National Home for Disabled Volunteer Soldiers v. Parrish, 229 U.S. 494, 496, 33 S.Ct. 944, 57 L.Ed. 1296 (1913)
 
 
 [13]
 See Standard Oil Co. v. United States, 267 U.S. 76, 79, 45 S.Ct. 211, 69 L.Ed. 519 (1925)
 
 
 [14]
 The trial judge concluded that "Plaintiff's Motion for Summary Judgment must be granted in regard to the claim for interest on its pro rata share of the Secondary Reserve for that part of calendar year 1971 that the share was held by Defendant . . . ." If FSLIC's check was not dated until December 13, 1971, it is obvious that it "held" North New York's share until that date