674 F.2d 1312
 HORIZON MUTUAL SAVINGS BANK, formerly Bellingham First
Federal Savings and Loan Association, Plaintiff-Appellant,
v.
FEDERAL SAVINGS & LOAN INSURANCE CORPORATION, an agency of
the United States government, Defendant-Appellee.
 No. 81-3029.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 1, 1982.
Decided April 21, 1982.
 
 John S. Ludwigson, McCush, Kinsbury, O'Conner, Ludwigson, Thompson & Hayes, Bellingham, Wash., for plaintiff-appellant.
 Paul W. Grace, Washington, D.C., argued, for defendant-appellee; Harvey Simon, Washington, D.C., on brief.
 Appeal from the United States District Court for the Western District of Washington.
 Before SNEED, ANDERSON and REINHARDT, Circuit Judges.
 REINHARDT, Circuit Judge:
 
 
 1
 Horizon Mutual Savings Bank appeals from an order granting summary judgment in favor of defendant, the Federal Savings & Loan Insurance Corporation (FSLIC). Horizon terminated its insurance with FSLIC on November 9, 1979, but FSLIC did not return Horizon's reserve account funds until January 10, 1980. Interpreting its own regulations, FSLIC concluded that Horizon was not entitled to "a return" on this money. The district court limited its review to determining whether or not FSLIC's decision had a rational basis, and found that FSLIC's interpretation was not demonstrably irrational. We affirm.
 
 
 2
 Horizon converted from a savings and loan association to a mutual savings bank and terminated its insurance with FSLIC on November 9, 1979. Institutions insured with FSLIC are required to pay annual premiums into FSLIC's primary reserve account, and from 1962 until August 1973, additional payments of future premiums were paid into the secondary reserve fund. These reserves are the source of insurance payments to individuals should an institution fail. When insurance is terminated, FSLIC must refund an institution's pro rata share of the secondary reserve. After normal processing, Horizon's pro rata share of the secondary reserve fund was forwarded to it by FSLIC on January 10, 1980.
 
 
 3
 FSLIC is required by 12 U.S.C. § 1727(e) (1976) to credit the secondary reserve fund with "a return" on the outstanding balances in that account "as of the close of each calendar year," at a rate determined by FSLIC.[1] A "return" represents FSLIC's earnings on funds held in the secondary reserve account. Horizon's pro rata share of the secondary reserve fund was computed on the basis of its interest in the fund account as it stood at the time Horizon terminated its insurance on November 9, 1979. Thus, the return for 1979 had not been credited to the secondary reserve fund at the time the computation was made. Accordingly, the pro rata share Horizon received did not include any "return" for 1979.
 
 
 4
 Horizon maintains that 12 C.F.R. § 563.16-2(a) (1981), a regulation adopted pursuant to section 1727(e), requires FSLIC to pay a return on funds not paid out to a terminated institution by December 31. This section provides as follows:
 
 
 5
 § 563.16-2 Secondary reserve.
 
 
 6
 (a) Annual credit to secondary reserve-
 
 
 7
 (1) General provisions. The Corporation shall credit to the secondary reserve, as of the close of each calendar year, a return on the outstanding balances of the secondary reserve, as determined by the Corporation, at a rate equal to the average annual rate of return to the Corporation during the year ending at the close of November 30 of such calendar year, as determined by the Corporation, on investments held by the Corporation in obligations of, or guaranteed as to principal and interest by the United States. The Corporation shall maintain records showing each insured institution's pro rata share of the secondary reserve and shall apportion the credit mentioned in the next previous sentence among all insured institutions on the basis of the average of the daily balances of their respective pro rata shares of the secondary reserve during the calendar year just closed, except as otherwise provided in this section.
 
 
 8
 (2) Exhaustion of pro rata shares of secondary reserve. In the event that the remainder of an insured institution's pro rata share of the secondary reserve is used to discharge a percentage of such insured institution's annual insurance premium pursuant to § 563.15(b)(2), such insured institution shall be entitled to share in the credit apportioned pursuant to paragraph (a)(1) of this section for the period between the date on which the remainder of such insured institution's pro rata share was used to discharge a percentage of that insured institution's annual insurance premium and the December 31 immediately preceding such date. Insured institutions entitled to credit pursuant to this paragraph (a)(2) shall be paid such credit in cash as soon as possible after the amount of such credit is determined by the Corporation.
 
 
 9
 (3) Termination of insurance. If, prior to the close of any calendar year, (i) an institution's insurance is terminated, and (ii) such institution's pro rata share of the secondary reserve is paid out of such reserve, such institution shall not receive a return on such pro rata share for such calendar year.
 
 
 10
 Subparagraph (1) provides for the crediting of returns, and their apportionment among insured institutions on an annual basis. It is the only part of the regulation which contains an affirmative provision for the crediting and apportionment of returns, except for a provision in subparagraph (2) which requires partial crediting and apportionment of the annual return in the case of institutions whose pro rata shares of the secondary reserve are exhausted during the calendar year as a result of the normal use of those shares for the payment of annual premiums. Horizon contends, however, that the subparagraph (1) clause "except as otherwise provided in this section," refers to subparagraph (3), thus making the provisions in subparagraph (1) subordinate to subparagraph (3). According to Horizon, subparagraph (3) prohibits payment of a return only when an institution's insurance is terminated and its pro rata share is paid out, both before the end of the year. Because Horizon terminated before year-end, but its money remained in the fund until after December 31, Horizon maintains that subparagraph (3), when read in light of the "except as otherwise provided" clause of subparagraph (1), requires the payment of a return on that money.
 
 
 11
 FSLIC interprets subparagraph (3) as only setting forth a prohibition, albeit a prohibition against paying a return in cases where an institution's coverage is terminated before year-end and its share is paid out. It claims that the subparagraph does not impose an affirmative duty to pay a return under any circumstances, and that the only language requiring a return is in subparagraph (1), which mandates year-end apportionment of returns only "among all insured institutions," and in subparagraph (2) which is not applicable here. FSLIC contends that an "insured institution" is one whose accounts are insured by FSLIC, and argues that because Horizon cancelled its coverage in November, it ceased to be an "insured institution" before the end of the year. Thus, FSLIC says, Horizon was not an institution entitled to be credited with a return at the time the returns for 1979 were required to be, and were, credited.
 
 
 12
 In response to Horizon's argument that the subparagraph (1) clause "except as otherwise provided in this section" makes the provisions in subparagraph (1) subordinate to subparagraph (3), FSLIC points out that subparagraph (3) does not provide for any crediting of payments, and that, therefore, the subparagraph (1) clause does not refer to subparagraph (3) and is not subordinate to it. FSLIC contends that the "except as otherwise provided in this section" clause refers to subparagraph (2), and only to that subparagraph, since subparagraph (2), unlike subparagraph (3), contains an affirmative provision requiring the crediting of returns.[2]
 
 
 13
 FSLIC's interpretation of its regulation is consistent with the District of Columbia Circuit's opinion in North New York Savings Bank v. Federal Savings and Loan Insurance Corp., 515 F.2d 1355, 1362 (D.C.Cir.1975), in which the court said that section 1727(e) specifically limits payment of returns. The court found that the statute permits crediting interest only at year-end, based on shares in the secondary reserve fund at that time. Horizon reads North New York as requiring only that an institution's funds remain in the secondary reserve through December 31, not that the institution remain insured with FSLIC through that date. However, the District of Columbia Circuit noted that, "there is nothing unusual about requiring a policyholder to retain its status as of a certain date in order to share in the earnings of an insurance company's reserves." Id. at 1363 (emphasis added).
 
 
 14
 Horizon also attempts to distinguish North New York on the ground that FSLIC's regulation, 12 C.F.R. § 563.16-2(a), was promulgated after North New York withdrew its funds, and that the regulation should now be interpreted to require FSLIC to pay Horizon a return. FSLIC has had a longstanding practice, both prior and subsequent to the adoption of the regulation, of refusing a return to institutions which terminate their insurance before the end of the year. North New York supports the proposition that there is nothing unreasonable about the common practice of paying interest, or in this case a "return," only to entities insured as of a certain date, and that FSLIC's practice conforms to the Congressional policy underlying the statute.
 
 
 15
 Horizon disputes FSLIC's reading of the regulation, contending that FSLIC's refusal to pay a return for 1979 was contrary to the clear intent of the regulation and that it is unreasonable to interpret subparagraph (3) in a manner contrary to its apparent meaning.
 
 
 16
 Horizon cites Espinoza v. Farah Manufacturing Co., 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973), in support of the proposition that a court need not defer to an agency's interpretation of a regulation where there are compelling indications that the agency is wrong. Espinoza, however, did not involve an error in an agency's construction of its own regulation but an erroneous application of an agency's interpretive guideline by a district court. A better example of an agency's misinterpretation of its own regulation, to which courts need not defer, is provided by Hart v. McLucas, 535 F.2d 516 (9th Cir. 1976). Hart's flight instructor's license was suspended after he mistakenly certified hours of instruction in his students' logbooks. The relevant regulation, 14 C.F.R. § 61.59(a)(2) (1981), which prohibits the making of a "fraudulent or intentionally false entry," was construed by the FAA as attaching strict liability for false statements without regard to the scienter requirements implicit in the terms "fraud" or "intentional." On appeal, the court remanded for a ruling on the facts in light of the correct legal standard, saying that:
 
 
 17
 It is true, as the FAA asserts, that an administrative interpretation of a statute or regulation is to be accorded deference in judicial deliberations. However, when, as here, the administrative construction is clearly contrary to the plain and sensible meaning of the regulation, the courts need not defer to it. White v. Bloomberg, 345 F.Supp. 133, 147 (D.Md.1972); Francis v. Davidson, 340 F.Supp. 351, 368 (D.Md.), aff'd, 409 U.S. 904, 93 S.Ct. 223, 34 L.Ed.2d 168 (1972).
 
 
 18
 Hart v. McLucas, 535 F.2d at 520.
 
 
 19
 The Court in Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980), stressed the rule that deference should be given an agency's interpretation of its own regulations, and cautioned that "judges are not accredited to supersede Congress or the appropriate agency by embellishing upon the regulatory scheme." Id. at 565-66, 100 S.Ct. at 796. An agency's construction of a statute or regulation should be accepted unless it is "demonstrably irrational." Id. at 565, 100 S.Ct. at 796.
 
 
 20
 The question whether FSLIC's interpretation is "clearly contrary to the plain and sensible meaning of the regulation" or "demonstrably irrational" must be considered in light of the "great deference" we must give an agency's construction of its own regulations, a deference even greater than that we give when an agency is construing a statute it is charged with administering.
 
 
 21
 When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. 'To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' Unemployment Comm'n v. Aragon, 329 U.S. 143, 153 (67 S.Ct. 245, 250, 91 L.Ed. 136). ... When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.
 
 
 22
 Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).
 
 
 23
 FSLIC's regulation is certainly not drafted with clarity or precision. If subparagraph (1) clearly prohibited the payment of interest to institutions no longer insured as of the end of the year, there would be no reason for subparagraph (3) at all. The only purpose of subparagraph (3) would seem to be to attempt to clarify the ambiguity created in subparagraph (1) as a result of the use of the term "insured institution" without an accompanying explanation of the date on which the institution must be insured. However, subparagraph (3) not only fails to clarify that question, it adds to the uncertainty and creates additional confusion. FSLIC interprets subparagraph (3) as only specifying certain conditions under which receipt of a return is prohibited. Literally, that is true. However, the inference that a return may be credited where these conditions do not exist might well be drawn by many reasonable and educated readers.
 
 
 24
 Nevertheless, we are not free to reject FSLIC's interpretation of the regulation and substitute Horizon's. FSLIC's construction of the term "insured institution" is both rational and plausible. In fact, its interpretation of the regulation, as a whole, is more consistent with normal business practices and governmental policies than is Horizon's. The "except as otherwise provided" clause of subparagraph (1) clearly refers to subparagraph (2). Horizon's theory that it was intended to refer to subparagraph (3) as well is, at best, highly dubious. The fact that FSLIC botched its effort to clarify the meaning of "insured institution" and in so doing included a misleading subparagraph (3) in the regulation does not require a different result than we reach here.
 
 
 25
 We note also that Horizon does not argue, nor could it here, that it based its decision with respect to its termination of its insurance coverage on its understanding of the regulation. This case therefore does not raise any notice issue.
 
 
 26
 In light of the broad discretion granted FSLIC in interpreting its own regulations, and FSLIC's longstanding practice of crediting returns only to institutions still insured on December 31, we hold that the agency's construction is not "clearly contrary to the plain and sensible meaning of the regulation," Hart v. McLucas, 535 F.2d at 520, or, put differently, "demonstrably irrational," Milhollin, 444 U.S. at 565, 100 S.Ct. at 796.
 
 
 27
 The problem here is not an uncommon one. We are confronted with a poorly drafted regulation. It would be in the best interests of FSLIC, the institutions it serves, and the public, for the agency to revise its regulation and eliminate the confusing and misleading language it now contains.
 
 
 28
 AFFIRMED.
 
 
 
 [1]
 12 U.S.C. § 1727(e) provides:
 (e) Credits to secondary reserve; availability for losses; assignment or transfer of share of reserve. The Corporation shall credit to the secondary reserve, as of the close of each calendar year a return on the outstanding balances of the secondary reserve, during such calendar year, as determined by the Corporation, at a rate equal to the average annual rate of return to the Corporation during the year ending at the close of November 30 of such calendar year, as determined by the Corporation, on the investments held by the Corporation in obligations of, or guaranteed as to principal and interest by, the United States. Except as provided in subsections (f) and (g), the secondary reserve shall be available to the Corporation only for losses of the Corporation and shall be so available only to such extent as other accounts of the Corporation which are available therefor are insufficient for such losses. No right, title, or interest of any institution in or with respect to its pro rata share of the secondary reserve shall be assignable or transferable whether by operation of law or otherwise, except to such extent as the Corporation may provide for transfer of such pro rata share in cases of merger or consolidation, transfer of bulk assets or assumption of liabilities, and similar transactions, as defined by the Corporation for purposes of this sentence.
 
 
 [2]
 As we have noted, subparagraph (2) provides for a partial crediting of annual returns to institutions which exhaust their share of the secondary reserve during a calendar year when their secondary reserve funds are applied to the payment of their annual insurance premium. Such institutions are paid their pro rata share of the return credited to the secondary reserve account for that portion of the year when their funds remained in the secondary reserve. In 12 U.S.C. § 1727(g) (1976), Congress provided for the eventual exhaustion of the secondary reserve through such payments of premiums. D0595A 0110A # 2