**UNITED STATES of America,
Plaintiff, Appellee,**

v.

**AN ARTICLE OF FOOD, etc., et al.,
Defendants, Appellees.**

**Coco Rico, Inc., Claimant, Appellant.**

**No. 84–1390.**

United States Court of Appeals,
First Circuit.

Heard Oct. 3, 1984.
Decided Jan. 18, 1985.

12

Herman W. Colberg, San Juan, P.R., with whom Reichard, Colberg & Calaf, San Juan, P.R., was on brief, for appellant Coco Rico, Inc.

Jacqueline H. Eagle, Atty., Dept. of Justice, Washington, D.C., with whom Daniel F. Lopez-Romo, U.S. Atty., Eduardo E. Toro-Font, Asst. U.S. Atty., Hato Rey, P.R., Richard K. Willard, Acting Asst. Atty. Gen., J. Patrick Glynn, Atty., Dept. of Justice, Thomas Scarlett, Chief Counsel, Food and Drug Admin., and Michael A. Humphreys, Asst. Chief Counsel, Enforcement, Food and Drug Admin., Washington, D.C., were on brief, for appellee.

Before COFFIN and BOWNES, Circuit Judges, and WEIGEL,* Senior District Judge.

WEIGEL, Senior District Judge.

This is an appeal from the district court's grant of summary judgment. Appellant Coco Rico, Inc., manufactures in Puerto Rico a coconut concentrate called Coco Rico for use as an ingredient in soft drinks. The Coco Rico concentrate sold to beverage bottlers in Puerto Rico contains potassium nitrate, added for the purpose of developing and fixing a desirable color and flavor.[1] On March 10, 1982, the United States instituted *in rem* proceedings against three lots of bottled soft drinks located on the premises of Puerto Rican bottlers. The soft drinks contained Coco Rico concentrate. The government charged that potassium nitrate constitutes an "unsafe" food additive, making the beverages "adulterated" and subject to forfeiture under the Food, Drug, and Cosmetic Act ("the Act"), 21 U.S.C. section 301 et seq.[2] On March 24, 1982, the government seized the three lots of soft drinks pursuant to warrants issued by the district court.

The forfeiture complaints were answered by Coco Rico, Inc. as claimant. Coco Rico did not dispute that the beverages in question contained potassium nitrate. Rather, it alleged that (1) as neither the beverages nor the concentrate they contained had been shipped outside Puerto Rico, they had not travelled in interstate commerce and were therefore not subject to forfeiture, and that (2) the beverages were not "adulterated" within the meaning of the Act.

The three cases were consolidated and the government moved for summary judgment. In support of its motion, the government submitted affidavits of two food chemists, Dr. Shibko and Dr. Wade. These affidavits stated, in summary, that (1) both Dr. Shibko and Dr. Wade know of no scientific studies showing that potassium nitrate is safe for use in beverages; (2) both believe, based on their training and study of the scientific literature, that potassium nitrate is not generally recognized as safe for use in beverages; and (3) the levels of potassium nitrate contained in the beverages in question approach those feared toxic to infants.

Coco Rico submitted one affidavit in opposition to the motion for summary judgment, that of food chemist Algeria B. Caragay. Caragay's affidavit makes the following points:

1. In her opinion, nitrates and nitrites are not "food additives" within the meaning of the Act because they are "prior sanctioned" [presumably she refers to a provision of the Act quoted *post*, at page 6 and discussed *post*, at page 9];

2. She believes that on August 19, 1980, a Food and Drug Administration (FDA) Commissioner and an Assistant Secretary of Agriculture stated publicly that there was "no basis for the FDA or USDA to initiate any action to remove nitrite from foods at this time";

3. Although some studies have cast suspicion on nitrates and nitrites as possible carcinogens, she knows of no conclusive scientific evidence that the use of potassium nitrate in beverages is unsafe;

4. Nitrates have been approved by the FDA for use in curing meat; and

5. She knows of no difference in health effects between potassium nitrate as used in meat and as used in beverages.

It was not disputed that all of the potassium nitrate used by Coco Rico originated in New York.

Holding that the interstate shipment of the potassium nitrate was sufficient to

---

* Of the Northern District of California, sitting by designation.

1. In addition to selling its product to Puerto Rican bottlers, Coco Rico ships its concentrate to soft drink bottlers in the mainland United States. Prior to 1978, the concentrate shipped to the continental United States also contained potassium nitrate. Coco Rico subsequently developed a different concentrate formula for interstate sale; since 1978, the concentrate shipped to the continental United States contains no potassium nitrate.

2. Adulterated beverages are subject to forfeiture under the Act. 21 U.S.C. § 321(f) ("The term 'food' means (1) articles used for food and *drink* ....") (emphasis added)

bring the beverages under the jurisdiction of the Act, the district court granted summary judgment for the government. *United States v. An Article of Food Consisting of the Following, etc.,* 584 F.Supp. 230 (D.P.R.1984). The district court also found that because there was no dispute of the material fact that potassium nitrate constituted an "unsafe" food additive, the beverages were adulterated and subject to seizure as a matter of law. We affirm.

### 1. *Jurisdiction*

 Appellant contends that the seized beverages were not subject to forfeiture because they were to be sold only in Puerto Rico and not shipped in interstate commerce. The governing statute is 21 U.S.C. section 334(a)(1), which provides in pertinent part that:

[a]ny article of food ... that is adulterated ... when introduced into or while in interstate commerce *or while held for sale (whether or not the first sale) after shipment in interstate commerce* ... shall be liable to be proceeded against while in interstate commerce, or at any time thereafter ...

(emphasis added). Commerce between any state and Puerto Rico is "interstate" commerce for purposes of this statute.[3] 21 U.S.C. § 321(a)–(b). This court has held that the "shipment in interstate commerce" requirement is satisfied when adulterated articles held for in-state sale contain ingredients shipped in interstate commerce. *United States v. Dianovin Pharmaceuticals, Inc.,* 475 F.2d 100, 102–03 (1st Cir.), *cert. denied* 414 U.S. 830, 94 S.Ct. 60, 38 L.Ed.2d 65 (1973); *see also United States v. Cassaro Inc.,* 443 F.2d 153, 155–56 (1st Cir.1971); *United States v. Articles of Drug ... Wans,* 526 F.Supp. 703, 707 (D.P. R.1981). Because it is undisputed that the potassium nitrate added to the seized beverages was shipped in interstate commerce,

those beverages clearly fall within the scope of statutory forfeiture jurisdiction.

### 2. *Adulteration*

 21 U.S.C. section 348 provides in part that:

(a) A food additive shall, with respect to any particular use or intended use ... be deemed to be unsafe for the purposes of [21 U.S.C. § 342(a)(2)(C) ] unless [for purposes relevant here]

. . . .

(2) there is in effect ... a regulation issued under this section prescribing the conditions under which such additive may be safely used.

No such regulation authorizes the use of potassium nitrate in beverages. Therefore, if potassium nitrate is a "food additive", it is presumed to be "unsafe" under section 348(a). Any food product containing an "unsafe food additive" is "adulterated" for purposes of a forfeiture proceeding. 21 U.S.C. § 342(a)(2)(C). Thus, if potassium nitrate as used in Coco Rico is a "food additive", the seized beverages were adulterated and subject to forfeiture. *See* 21 U.S.C. § 334(a).

21 U.S.C. section 321(s) defines a "food additive" as:

any substance the intended use of which results ... in its becoming a component ... of any food ... if such substance is not generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures (or, in the case of a substance used in food prior to January 1, 1958, through either scientific procedures or experience based on common use in food) to be safe under the conditions of its intended use; except that such term does not include—

. . . . . . . . . . . . . . .

---

**3.** Coco Rico argues that an "exception" to the definition of Puerto Rico as a "state" contained in 21 U.S.C. section 372(a) somehow alters the analysis. The argument is misguided. Section 372(a) merely provides that the Secretary of Health and Human Services may treat Puerto Rico as a "territory" for purposes of conducting inspections of food products upon their entry into the remainder of the United States. It has nothing to do with the statutory definition of food products shipped in interstate commerce.

(4) any substance used in accordance with a sanction or approval granted prior to September 6, 1958 pursuant to this chapter ....

Appellant contends that summary judgment was improper because three genuine issues of fact were presented below as to why the potassium nitrate added to its concentrate is not a "food additive" within the meaning of section 321(s).

■■■ First, Coco Rico claims that Caragay's affidavit is sufficient to show the existence of a factual issue as to whether potassium nitrate is "generally recognized" by qualified experts as having been scientifically shown to be safe.[4] To fall within this exception, the substance must be generally recognized as safe *under the conditions of its intended use.* 21 U.S.C. § 321(s); *United States v. Articles of Food ... Buffalo Jerky,* 456 F.Supp. 207, 209 (D.Neb.1978) (general acceptance of sodium nitrate and sodium nitrite as safe for other uses did not establish that they were not "food additives" when used to cure buffalo meats).[5] The burden of proving general recognition of safe use is placed on the proponent of the food substance in question. *See* 21 U.S.C. § 348(a); *Fmali Herb, Inc. v. Heckler,* 715 F.2d 1385, 1391 (9th Cir.1983); *United States v. An Article of Food,* 678 F.2d 735, 739 (7th Cir.1982). Caragay's affidavit contained only statements to the effect that she knows of no conclusive scientific evidence that the use of potassium nitrate in beverages is *unsafe,* or that the health effects of potassium nitrate when used in beverages differ from those caused by its use in meats. Even if these allegations are true, they are insufficient to meet Coco Rico's burden of proving that the use of potassium nitrate in beverages is generally recognized by experts as *safe* based on scientific evidence.[6] *See United States v. Articles of Food and Drug, etc.,* 518 F.2d 743, 747 (5th Cir.1975) (a lack of *any* studies concerning effects of intended use cannot establish "general recognition" of safety).

■■■ For similar reasons, Coco Rico's second argument based on "common use" of potassium nitrate must also fail. Again, a substance may be excluded from classification as a "food additive" only if experience based on common use provides a basis for general recognition by scientists that the substance is safe *under the conditions of its intended use.* 21 U.S.C. § 321(s); *Fmali Herb,* 715 F.2d at 1390. The evidence submitted by Coco Rico tends to show that nitrates are naturally present in many foodstuffs, particularly vegetables, and that they have been used for many centuries to cure meats. No evidence was submitted to show that potassium nitrate has long been added to beverages.[7] Conse-

---

4. Appellant also refers to a study by the Health Department of Puerto Rico as sufficient evidence of the safe use of its concentrate to defeat summary judgment. The study allegedly concluded that Coco Rico was "safe for human consumption." Even if these allegations were true, evidence of the study would not tend to establish that potassium nitrate is *generally recognized* by experts as safe when added to beverages. *See Weinberger v. Bentex Pharmaceuticals, Inc.,* 412 U.S. 645, 652, 93 S.Ct. 2488, 2493, 37 L.Ed.2d 235 (1972) (general recognition of safe use established by controlled clinical studies published in recognized scientific literature); *Premo Pharmaceutical Laboratories, Inc., v. United States,* 629 F.2d 795, 803–04 (2d Cir. 1980); *United States v. Articles of Food· and Drug, etc.,* 518 F.2d 743, 747 (5th Cir.1975).

5. For this reason, Caragay's reference to a statement by FDA and USDA officials that there was no basis to initiate action to remove nitrite from

*foods* does not raise a genuine issue of fact as to its safe use in *beverages.*

6. The government, as recounted above, submitted two affidavits that were sufficient to demonstrate the existence of genuine dispute among qualified experts concerning the safe use of potassium nitrate in beverages in the quantities found in the seized soft drinks. This evidence was sufficient to preclude a finding of "general recognition" of safe use. *See Premo Pharmaceutical Laboratories, Inc. v. United States,* 629 F.2d 795, 803 (2d Cir.1980).

7. Coco Rico contends that, as it has continuously used potassium nitrate in the concentrate it sells to Puerto Rican bottlers since 1935 without any complaint of ill effects, its own experience and use of the ingredient indicates that it is safe. Use in one manufacturer's product does not constitute "common· use" in that food. *Cf. United States v. Naremco, Inc.,* 553 F.2d 1138, 1143

**16**

quently, there is no issue of fact as to whether common experience could show that potassium nitrate is not a "food additive" when used in beverages.

■ The third and final exception to the "food additive" definition invoked by Coco Rico is the one applicable to substances used in accordance with a sanction issued by the FDA prior to 1958. The evidence adduced by appellant shows only that potassium nitrate continues to be sanctioned by the FDA for use in curing meat. The sanction permitting very limited use of potassium nitrate in meats cannot be construed to sanction use of the same substance for an altogether different purpose in beverages. *See Public Citizen v. Foreman,* 631 F.2d 969, 977 (D.C.Cir.1980); *Articles of Food ... Buffalo Jerky,* 456 F.Supp. at 209–10. "A prior sanction shall exist only for a specific use(s) of a substance in food, i.e. the level(s), condition(s), product(s), etc. for which there was explicit approval ...." 21 C.F.R. § 181.5 (1984).

In sum, we conclude that the seized beverages were "held for sale ... after shipment in interstate commerce" under 21 U.S.C. section 334(a)(1) and that the FDA properly exercised jurisdiction over them. We also hold that, as a matter of law, the potassium nitrate found in the beverages constitutes an unsafe food additive under 21 U.S.C. section 321(s), making the beverages subject to forfeiture as an adulterated food.

The district court's grant of summary judgment is affirmed.

n. 7 (8th Cir.1977); *United States v. An Article of Drug ... Bentex Ulcerine,* 469 F.2d 875, 879 (5th Cir.1972), *cert. denied* 412 U.S. 938, 93 S.Ct. 2772, 37 L.Ed.2d 397 (1973).