**UNITED STATES of America, Plaintiff,**

v.

**50 BOXES [OF] ... CAFERGOT P–B SUPPOSITORIES, Defendants.**

**Civ. A. 86–1630–WF.**

United States District Court,
D. Massachusetts.

Sept. 1, 1989.

Paul G. Levenson, Asst. U.S. Atty., William F. Weld, U.S. Atty., Peter E. Gelharr, Asst. U.S. Atty., Boston, Mass., for plaintiff.

Mary Morrissey Sullivan, Sullivan, Sullivan & Pinta, Boston, Mass., for Sandoz Pharmaceuticals Corp.

## MEMORANDUM AND ORDER

WOLF, District Judge.

This is an *in rem* forfeiture action brought by the United States under the Federal Food, Drug, and Cosmetic Act ("FDA Act"), 21 U.S.C. § 301 *et seq.*, seeking that the seized defendant drug, Cafergot P–B Suppository ("CPB Suppository") be forfeited and destroyed. The complaint alleges that CPB Suppository is a "new drug" within the meaning of 21 U.S.C. § 321(p), which may not be introduced into interstate commerce without Federal Food and Drug Administration ("FDA") approval.

Claimant Sandoz Pharmaceuticals Corporation ("Sandoz" or "claimant") opposes forfeiture on the grounds that CPB Suppository is exempted from the FDA approval requirement asserting (1) CPB Suppository is not a "new drug" because it has been generally recognized as safe and ef-fective; and (2) CPB Suppository is covered by a 1962 "grandfather clause," which exempts from the approval requirements some drugs that were on the United States market before the 1962 amendments to the FDA Act.

The United States has moved for summary judgment, arguing that neither exception to the FDA approval requirement is met in this case. A hearing on that motion has been held. Based upon consideration of the voluminous submissions of the parties and the arguments of each side, the court concludes that plaintiff's motion for summary judgment must be allowed.

## I. *Facts*

Unless otherwise indicated, the following facts are undisputed.

CPB Suppository is a drug within the meaning of 21 U.S.C. § 321(g)(1), and the CPB Suppository that has been seized was shipped in interstate commerce. *See* 21 U.S.C. § 355(a); Complaint and Answer ¶ 1. There are four active ingredients in CPB Suppository: 2 mg. ergotamine tartrate; 100 mg. caffeine; 60 mg. pentobarbital; and 0.25 mg. bellafoline. It also contains four inactive ingredients: tartaric acid; malic acid; lactose; and cocoa butter. *See* Affidavit of Dr. Robert Temple, Director, Office of Drug Evaluation, Food and Drug Administration ¶ 10 (October 19, 1988). Two of the active ingredients (ergotamine tartrate and caffeine) are found in identical amounts in Sandoz's Cafergot Suppository, which has received FDA approval. Both Cafergot and CPB Suppository are sold for the treatment of vascular headaches, including migraines. The two additional active ingredients in CPB (the "P–B") were apparently designed to treat the tension and gastrointestinal distress that were sometimes side-effects of Cafergot. *See* Affidavit of Dr. James D. Dexter, University of Missouri School of Medicine ¶¶ 7–8 (January 27, 1989).

Sandoz first marketed CPB Suppository in the United States in 1955. Temple Aff., Exh. 1. Sandoz did not submit or receive approval of a new drug application ("NDA") for the drug prior to marketing,

perhaps because the FDA had informally advised the firm that CPB Suppository was not a new drug.[1] *See Id.* ¶¶ 13–14. On July 27, 1972, the FDA published a drug efficacy study implementation (DESI) notice [2] in the *Federal Register* stating that Sandoz's *Cafergot* Suppository (as opposed to CPB Suppository) had been reviewed and found to be effective for relief of vascular headaches. DESI Notice 9529, 37 Fed.Reg. 15,032 (1972); Affidavit of Rudolph Apodaca, Director, Division of Drug Labeling Compliance, Exh. 3 (October 14, 1988). In 1977, the FDA informed Sandoz that the agency considered CPB Suppository to be an unapproved new drug that was related to Cafergot Suppository, and that CPB Suppository was subject to regulatory action—that is, seizure—because of its unapproved new drug status. Apodaca Aff., Exh. 4.

In 1985, the FDA sent Sandoz a "Regulatory Letter," which again advised Sandoz that CPB Suppository was an unapproved new drug subject to seizure. The FDA advised Sandoz that it should discontinue the sale of CPB Suppository and recall significant stocks of the drug from the market. Apodaca Aff., Exh. 5.

In response, Sandoz sent a series of letters to the FDA in an attempt to persuade the FDA to take no regulatory action against its drug. Apodaca Aff., ¶¶ 19, 20, 21. Sandoz also submitted an NDA for CPB Suppository. The FDA viewed this application as incomplete and returned it to Sandoz. Temple Aff., ¶¶ 15–20.

After the FDA refused to accept the NDA for CPB Suppository, the agency conducted an inspection to determine whether Sandoz was continuing to ship CPB Suppository in interstate commerce. Upon determining that Sandoz was continuing to market the drug, the government instituted this forfeiture action.

Additional relevant facts are discussed in the following conclusions of law.

1. All such informal opinions were formally revoked in 1968. 21 C.F.R. § 310.100(d) (1988).

## II. *Conclusions of Law*

### A. Summary Judgment Standard

The court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56(c) provides that the court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In addition, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party." *Stepanischen v. Merchants Despatch Transportation Corp.,* 722 F.2d 922, 928 (1st Cir.1983).

However, to survive a summary judgment challenge on the basis of disputed material facts, the plaintiff must produce substantial evidence, going beyond the allegations of the complaint and supporting the claimed dispute, which would require a judge or jury to resolve the conflicting versions of the truth at trial. *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). *See also Anderson v. Liberty Lobby,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Matsushita Electrical Industrial Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (opponent must "do more than simply show that there is some metaphysical doubt as to material facts").

In deciding motions for summary judgment, the court must make two inquiries: (1) whether the factual disputes are genuine, and (2) whether any fact genuinely in dispute is material. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. "As to materiality, the substantive law will identify which facts are material." *Id.* To determine if the dispute about a material fact is "genuine," the court must decide whether "the

2. As required by the 1962 amendments to the FDA Act, the FDA issued DESI Notices to NDA holders indicating whether the drugs in question had been found to be effective.

evidence is such that a reasonable [fact-finder] could return a verdict for the non-moving party." *Id.*

In this case, the court concludes that the United States is entitled to summary judgment because claimant has not offered adequate evidence to support its contentions that (1) CPB Suppository is generally recognized as safe and effective; and (2) CPB Suppository need not be generally recognized as safe and effective because it is exempted from this requirement by a grandfather clause applicable to certain drugs on the market before 1962.

**B. CPB Suppositories Are Not Generally Recognized as Safe and Effective**

■ Since 1962, the FDA Act has required manufacturers to prove that a "new drug" is both safe and effective in order to obtain FDA approval for its sale. 21 U.S.C. § 355(a) and (b). Sandoz has not received FDA approval for CPB Suppository. Sandoz, however, asserts, that CPB Suppository is not a "new drug" subject to the approval requirement because it satisfies the requirements of 21 U.S.C. § 321(p), which excludes from the definition of "new drug" those products which are "generally recognized, among experts ... as safe and effective."

For the purposes of the pending motion for summary judgment it is important to recognize that:

> Where a dispute exists as to whether a drug product is "generally recognized" by the experts to be safe and effective, the function of the district court is limited to determining that issue, not whether the product (including one claimed to be a "me-too" drug) is in fact safe and effective. The latter issue is to be determined by the FDA which, as distinguished from a court, possesses superior expertise, usually of a complex scientific nature, for resolving that issue.

*Premo Pharmaceuticals Laboratories, Inc. v. United States*, 629 F.2d 795, 803 (2d Cir.1980). Thus, as the Court of Appeals for the First Circuit has found, the existence of a genuine dispute among qualified experts concerning the safety or effectiveness of a drug is sufficient to preclude a finding of the "general recognition" necessary to exempt that product from the FDA's approval requirement. *United States v. An Article of Food (Coco-Rico, Inc.)*, 752 F.2d 11, 15 n. 6 (1st Cir.1985) (citing *Premo*, 629 F.2d at 803).[3] Where a careful analysis of the expert evidence shows a sharp difference of opinion, there is not a triable issue as to "general recognition." *United States v. 5906 Boxes*, 745 F.2d 105, 119 n. 22 (1st Cir.1984), *cert. denied*, 470 U.S. 1004, 105 S.Ct. 1358, 84 L.Ed.2d 379 (1985). Rather, in such cases, the United States is entitled to summary judgment. *Id.*

In addition, even if experts generally recognize a drug to be safe and effective, an exemption under § 321(p) is merited only if that consensus is based upon the same quantity and quality of scientific evidence needed to obtain FDA approval of a new drug. *Weinberger v. Hynson, Westcott & Dunning*, 412 U.S. 609, 619, 93 S.Ct. 2469, 2478, 37 L.Ed.2d 207 (1973); *Weinberger v. Bentex Pharmaceuticals*, 412 U.S. 645, 652–53, 93 S.Ct. 2488, 2493–94, 37 L.Ed.2d 235 (1973); *United States v. Rutherford*, 442 U.S. 544, 549 n. 7, 99 S.Ct. 2470, 2474 n. 7, 61 L.Ed.2d 68 (1979); *5906 Boxes*, 745 F.2d 105 at 117–19. This means that any expert consensus on safety and effectiveness must be based upon "substantial evidence," which is defined by statute as "evidence consisting of adequate and well-controlled investigations including clinical investigations." 21 U.S.C. § 355(d). The applicable regulations amplify this definition, requiring "adequate and well-controlled studies" for approval of a new drug. 21 C.F.R. of § 314.126 (1988). Mere case studies or the personal opinions of experts are unacceptable.

As the Supreme Court has explained:
> Evidence may be accepted only if it consists of "adequate and well-controlled in-

---

3. *Coco Rico* dealt with food additives, but the "general recognition" test is the same for additives and new drugs. *United States v. 7 Cartons:*

*Ferro-Lac*, 293 F.Supp. 660, 662 (S.D.Ill. (1968), *aff'd*, 424 F.2d 1364 (7th Cir.1970).

vestigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved...." § 505(d), 21 U.S.C. § 355(d). The legislative history of the Act indicates that the test was to be a rigorous one. The "substantial evidence requirement reflects the conclusion of Congress, based upon hearings, that clinical impressions of practicing physicians and poorly controlled experiments do not constitute an adequate basis for establishing efficacy. This policy underlies the regulations defining the contours of "substantial evidence": "Uncontrolled studies or partially controlled studies are not acceptable as the sole basis for the approval of claims of effectiveness. Such studies, carefully conducted and documented, may provide corroborative support of well-controlled studies.... Isolated case reports, random experience, and reports lacking the details which permit scientific evaluation will not be considered." 21 CFR § 130.12(a)(3)(ii)(c).

*Hynson*, 412 U.S. at 630, 93 S.Ct. at 2483.

In view of the foregoing, Sandoz is incorrect when it claims that the evidence required to support a judicial finding of an exemption under § 321(p) is less than the evidence required to obtain FDA approval of a new drug. The court acknowledges that Supreme Court *dicta* in *Bentex* states it might be "true that in some cases general recognition that a drug is efficacious might be made without the kind of scientific support necessary to obtain approval of an NDA." 412 U.S. at 652, 93 S.Ct. at 2493. The Court of Appeals for the First Circuit, however, has since held that:

Under the *Hynson* decision, *supra*, the evidentiary standards for effectiveness required for a new drug application under 21 U.S.C. § 355(d) must also be applied to any drug for which "general recognition of effectiveness among experts" is claimed under § 321(p). Section 355(d)(5) requires that an application be rejected if the FDA finds a "lack of substantial evidence that the drug will have the effect it purports to have." Substantial evidence is defined in the same subsection as "evidence consisting of *adequate and well-controlled* investigations, [conducted] by experts."

*5906 Boxes*, 745 F.2d at 117 (emphasis in original). This court must, of course, apply the law as interpreted by the Court of Appeals for the First Circuit. The correctness of that interpretation, however, is confirmed by the recent decision in *United States v. 225 Cartons More or Less of an Article of Drug*, 871 F.2d 409, 418–19 (3rd Cir.1989). In that case, Sandoz made the same claim for a relaxed, more flexible evidentiary standard which is presented here, and that claim was expressly rejected by the Court of Appeals for the Third Circuit. *Id.*

The foregoing standards have been described in some detail because when they are understood it is evident that CPB Suppository is a "new drug," and that the United States is entitled to summary judgment. As described below, the United States has, at a minimum, introduced ample evidence of a disagreement among experts regarding the safety and effectiveness of CPB Suppository to defeat Sandoz's claim that its product is exempt from the requirements of FDA approval by virtue of being generally recognized as safe and effective. Moreover, Sandoz's experts acknowledge that there is not "substantial evidence"—as that term is defined in the statute, regulations and case law—to support any opinion that CPB Suppository is safe and effective.

More specifically, the United States has submitted detailed affidavits of Dr. Robert Temple and Dr. Russell Katz, both of whom are employed by the FDA. Sandoz concedes that each of these experts is eminently well qualified. Dr. Temple and Dr. Katz each assert that neither they nor other experts generally recognize CPB Suppository as safe and effective. Temple Aff., ¶ 26–34, 27–38, Attachments A, B; Katz Aff., ¶ 14–24, 28, Attachment A. In addition, Drs. Temple and Katz each carefully describe why the available information concerning CPB Suppository is insufficient to constitute "substantial evidence"

regarding its safety and effectiveness.[4] Even if properly disputed, the factually supported opinions of Dr. Katz and Dr. Temple would alone be adequate to merit summary judgment for the United States because they show, at a minimum, that experts do not "generally recognize" that CPB Suppository has been shown to be safe and effective. *Coco–Rico*, 752 F.2d at 15 n. 6; *Premo*, 629 F.2d at 803; *5906 Boxes*, 745 F.2d at 119 n. 22.

In this case, however, the evidence presented by the United States is not properly disputed. Sandoz's experts claim CPB Suppository is safe and effective, but acknowledge that their opinions rest on information which would be inadequate to earn CPB Suppository approval as a new drug. For example, Dr. James Dexter submitted on behalf of Sandoz an affidavit which states in part:

> Certainly none of the published studies that discuss CPB Suppository would pass muster if they were submitted to justify the approval of the product as a new drug that had never been marketed.

Dexter Aff., ¶ 7. Other of Sandoz's experts make comparable concessions. *See, e.g.*, Elkind Aff., ¶ 7; Gallagher Aff., ¶ 5. Essentially, Sandoz's experts argue that while there may not be the scientific studies conventionally required to obtain FDA approval of a new drug, less rigorous information concerning CPB Suppository and its long use should be sufficient to earn it a judicial exemption as "generally recognized" by experts as safe and effective.

As indicated earlier, however, this argument is incorrect as a matter of law. Unless this court finds "substantial evidence" adequate to earn FDA approval of a new drug to support a consensus of experts that CPB Suppository is safe and effective, the United States is entitled to summary judgment. *See 5906 Boxes*, 745 F.2d at 117–19. The evidence in the instant case, viewed in the light most favorable to Sandoz, does not permit this inference. Thus, unless the grandfather clause protects CPB Suppository, the court must defer to the FDA to determine whether that drug is safe and effective.

## C. The Grandfather Clause is Inapplicable

■ The undisputed facts demonstrate that the relevant grandfather clause does not exempt CPB Suppository from compliance with the requirements for "new drugs" that it has failed to satisfy.

Since its inception in 1938, the FDA Act has required that drugs be safe. *5906 Boxes*, 745 F.2d at 108. The 1962 amendments to the FDA Act added the requirement that drugs also be effective. *See* Pub.L. 87–781 § 102, 76 Stat. 781 (Oct. 10, 1962). A grandfather clause in the 1962 amendments specifically exempts from the effectiveness requirement some drugs that were on the market before the 1962 amendments, if certain conditions are met. *Id.* at § 107(c)(4), *reprinted at* 21 U.S.C. § 321 (note).[5] The Court of Appeals for the First Circuit has stated that the grandfather clause:

---

4. It is undisputed that no clinical study has ever been done concerning CPB Suppository. Beginning in 1977, Sandoz conducted a study concerning CPB *tablet*. Temple Aff., Attachment A; Katz Aff., Attachment A. That study, however, may not be considered substantial evidence regarding CPB *Suppository* in part because the active ingredients in the two drugs are in different proportions. *See* 21 C.F.R. § 310(h)(3) (newness may arise from different proportions). In addition, the two drugs do not have the same inactive ingredients. Apodaca Aff., ¶ 2; *5906 Boxes*, 745 F.2d at 118, n. 20 (a finding that a drug is generally recognized as safe and effective based upon tests concerning another drug is appropriate only if the two drugs are shown to be at least equivalent and perhaps identical).

5. The grandfather clause states:

> In the case of any drug which, on the day immediately preceding the enactment date [i.e., October 9, 1962], (A) was commercially used or sold in the United States, (B) was not a new drug as defined by section 201(p) of the basic Act as then in force, and (C) was not covered by an effective application under section 505 of that Act, the amendments to section 201(p) made by this Act shall not apply to such drug when intended solely for use under conditions prescribed, recommended, or suggested in labeling with respect to such drug on that day.

sets forth four conditions that must have been true as of October 1962 for a drug to be exempt from the Act as amended: (A) the drug must have been commercially used or sold in this country before 1962; (B) it must not have been within the definition of a "new drug" in the 1938 Act; (C) it must not have been covered by an effective new drug application; and (D) it must currently be "intended solely for the use under conditions" prescribed or recommended in its 1962 labeling. *5906 Boxes*, 745 F.2d at 108. In essence, "the 1962 grandfather clause simply relieved manufacturers of pre–1962 drugs from having to demonstrate the effectiveness of their drugs, so long as the drugs were generally recognized among experts as safe for certain uses in 1962 and no new conditions of use for the drug are suggested by the manufacturer."

In order to be protected by the grandfather clause, a drug must satisfy all four of its criteria. Moreover, "as an exemption to a comprehensive regulatory statute concerned with public safety, the grandfather clause is to be strictly construed, and [Sandoz] bears the burden of proof as to each condition." *Id.* at 113.

In the instant case, the undisputed facts, even when viewed most favorably to Sandoz, indicate that CPB Suppository does not satisfy at least three of the four requirements of the grandfather clause. More specifically, the evidence demonstrates that the CPB Suppository label indicating conditions under which the drug should be used has materially changed since 1962; CPB Suppository was not in 1962 within the definition of a "new drug" in the 1938 FDA Act because there was inadequate scientific evidence concerning it; and CPB Suppository was "covered by" an NDA for Cafergot.

### 1. *Labeling*

As indicated earlier, the grandfather clause requires that a drug be *currently*

intended *solely* for use under the conditions prescribed or recommended on its 1962 label. *Id.* at 108. None of the facts material to the labeling issue in this case are in dispute. Thus, the only issue to be resolved is one of law for the court. *Id.* at 114.

A comparison of the facts of this case with those in *5906 Boxes* shows that the current CPB Suppository label recommends its use in at least four ways which are, as a matter of law, significantly different than the uses recommended by the 1962 label.[6] *Compare* Affidavit of Harriet A. Vickory, Executive Director of Compliance, Sandoz Pharmaceuticals, Exh. 2 (label dated August 31, 1962) *with* Affidavit of Rudolf Apodaca, Director, Division of Drug Labeling Compliance, U.S. Food and Drug Administration, Exh. 1 (label at time of seizure). *5906 Boxes* involved WANS, an anti-nausea suppository. *Id.* In that case, the newer label was found to be significantly changed for several reasons. First, the 1962 WANS label recommended the drug's use when nausea and vomiting were caused by eleven specific conditions, but the newer label recommended WANS for any condition causing nausea and vomiting. *Id.* at 115. Second, the 1962 label for WANS had recommended its use for children as well as adults, but the later label did not suggest it be used by children. *Id.* Third, the newer WANS label had an additional warning about the risk associated with its use—a link between the drug and Reye's Syndrome. *Id.* In view of these facts, the Court of Appeals for the First Circuit found that the changes in the WANS label were sufficient to remove it from the protection of the grandfather clause.

The same conclusion is compelled concerning CPB Suppository. The 1962 label for CPB Suppository recommends that it be used to treat an existing headache. *See* Vickory Aff., Exh. 2. The label on the drug seized in this case, however, recommends its use to prevent a headache, as

---

**6.** As the changes in the CPB Suppository label since 1962 are *significant* in this case, it is not necessary to decide whether the United States' contention that *any* change in a label will defeat a claim for protection under the grandfather clause. *See 5906 Boxes*, 745 F.2d 114–15.

well as to treat a headache. Apodaca Aff. ¶ 5, Exh. 1, 2. Thus, as in *5906 Boxes*, the recommended uses of the CPB Suppository have been expanded since 1962.

Similarly, and again as in *5906 Boxes*, while the 1962 label for CPB Suppository recommended its use for children, its present label does not. Apodaca Aff., ¶ 8 and Exh. 1. Moreover, the current CPB Suppository label adds the warning that it is contraindicated because of potential ergotism, sepsis, and hypersensitivity, and also newly warns of additional potential harmful side effects, adverse reactions, and overdoses. *Id.* Finally, the 1962 label recommended that only four CPB Suppositories be used each week, but the current label recommends use of up to five.

As the Court of Appeals for the First Circuit found in *5906 Boxes*, the foregoing labeling changes show that since 1962 new information has been developed about the health effects of CPB Suppository which Sandoz considered reliable and important enough to place on its label. 745 F.2d at 115. The First Circuit has reminded that "[t]he general purpose of the [FDA] Act would be ill-served if such new labeling information had no effect on an unapproved drug's regulatory status." *Id.* Thus, in the circumstances of this case, Sandoz has not borne its burden of showing that CPB Suppository satisfies the essential labeling prong of the grandfather clause test.

### 2. *Scientific Testing*

Even if CPB Suppository met the labeling requirement of the grandfather clause, it would not be protected because it was within the definition of a "new drug" under the 1938 FDA Act. More specifically, to escape being characterized as a "new drug" in 1962, CPB Suppository would have had to have been generally recognized, by qualified experts, as safe in 1962, and that safety would have to have been demonstrated by contemporaneous, valid scientific tests. *Id.* at 115–17. To satisfy this prong of the grandfather clause, pre-1962 "laboratory and clinical tests," *id.* at 115, including some empirical testing on

humans, *id.* at 116, demonstrating a drug's safety are required.

On behalf of the United States, Dr. Katz asserts that as of 1962 there was not adequate data to support any alleged general recognition of safety. Dr. Katz states that based on Sandoz's submissions and the FDA's literature search he concludes that:

> there are absolutely no studies, including laboratory tests and clinical studies, submitted on the basis of which experts could have decided prior to October 10, 1962 that CPB Suppository was generally recognized as safe.

Katz Aff., ¶ 15. *See also* Temple Aff. ¶ 28.

To rebut this conclusion, Sandoz relies on the opinions of its experts that CPB Suppository was generally recognized as safe in 1962. These opinions are based on the experts' (1) knowledge of the ingredients of CPB Suppository; (2) review of the literature prior to October, 1962, and (3) clinical experience. Dexter Aff., ¶ 11; Affidavit of Arthur Elkind, Assistant Professor of Medicine, New York Medical College, ¶ 11 (January 25, 1989); Affidavit of Dr. R. Michael Gallagher, Associate Director, Diamond Head Clinic, ¶ 7 (January 30, 1989); Affidavit of Dr. Neil H. Raskin, Professor of Neurology, University of California School of Medicine, San Francisco, ¶ 9; Affidavit of Dr. Joel R. Saper, Director, Michigan Headache & Neurological Institute, ¶ 8 (January 19, 1989); Affidavit of Dr. Fred D. Sheftell, Co–Director, New England Center for Headache, ¶ 13 (January 20, 1989). However, an expert's knowledge of the ingredients of CPB Suppository and his clinical *experience* are not "contemporaneous, valid scientific tests." Thus, they are inadequate to provide a legally sufficient basis for finding general recognition of safety as of October, 1962. *Id.* at 115–17.

Sandoz's experts' affidavits confirm that the scientific literature published prior to October, 1962 does not contain the type of evidence of "contemporaneous, valid scientific tests" required by the First Circuit's interpretation of the statutory requirements. None of Sandoz's experts claim that laboratory tests were performed using CPB suppository. *See 5,906 Boxes*, 745

F.2d at 115. This is consistent with the United States' assertion that there were then no such tests on which experts could have based an opinion on the drug's safety. Katz Aff., ¶ 15.

Moreover, each of Sandoz's experts also has acknowledged that the pre-October 10, 1962 literature on CPB Suppository does not indicate that any other kind of scientific tests have been documented. *See* Dexter Aff. at ¶ 7 ("[T]he literature in this area is not of high quality.... '[I]ndividual reports do not show direct scientific proof of the drug's safety ...'"); Elkind Aff., ¶ 9 (Sandoz does not have any "documented, replicable, controlled experiments" on CPB Suppository, but rather "long-term accumulated experience that is the result of the application of trial-and-error methodology."); Saper Aff. at ¶ 6 ("None of these reports of clinical experience are controlled clinical studies...."); Sheftell Aff., ¶ 8 (The reports in the literature on CPB Suppository are "historical reports" that "do not, in general, provide 'hard data' as to the safety" of CPB Suppository).

Thus, because there is no evidence of the contemporaneous, valid scientific testing of CPB Suppository for safety prior to 1962, Sandoz's evidence is insufficient to support a finding that CPB Suppository was generally recognized as safe prior to 1962. It was, therefore, then a "new drug." Thus, it is not protected by the grandfather clause. *See 5906 Boxes*, 745 F.2d at 115, 117.

The fact that in about 1955, the FDA told Sandoz informally that CPB Suppository was not a "new drug" does not alter this conclusion. That informal advice was revoked in 1968 by regulation. *See* 21 C.F.R. § 310.100. Moreover, it has been recognized that such informal advice is "not determinative, since the 1962 Amendments altered the definition of what constituted a "new drug." *SmithKline Corp. v. Food & Drug Administration*, 587 F.2d 1107, 1115 n. 15 (D.C.Cir.1978) (citing *USV Pharmaceutical Corp. v. Weinberger*, 412 U.S. 655, 93 S.Ct. 2498, 37 L.Ed.2d 244 (1973). *See also United States v. Articles of Drug ... Hormonin*, 498 F.Supp. 424, 435–36

(D.N.J.1980), *aff'd*, 672 F.2d 904 (3d Cir. 1981).

3. *"Coverage" by an Effective NDA*

A third requirement of the grandfather clause is that CPB must not have been "covered" by another drug's effective NDA on October 9, 1962. CPB Suppository fails to satisfy this criteria also.

The term "covered" in this context means that the drug in question is "identical, similar, or related" to a drug that is the subject of an effective NDA. *See* 21 C.F.R. § 310.6. A "similar" or "related" drug is one that is "related in chemical structure or known pharmacological properties" or a "combination drug product containing a drug that is identical, similar, or related to a drug named in a [Federal Register] notice." 21 C.F.R. §§ 310.6(b)(1), (2). *See also USV Pharmaceutical Corp. v. Weinberger*, 412 U.S. 655, 663–67, 93 S.Ct. 2498, 2504–06, 37 L.Ed.2d 244 (1973) ("metoo" drugs are "similar" under grandfather clause).

In October, 1962, CPB Suppository was "related" to Cafergot and, therefore, "covered" by Cafergot's NDA. The two ingredients in Cafergot Suppository are present in equal amounts in CPB Suppository. Apodaca Aff. ¶ 2. Exh. 1. The labeling for the two drugs is virtually identical. Temple Aff. ¶ 35–36. Indeed, Sandoz attempted to gain FDA approval of CPB Suppository as a supplement to the Cafergot NDA. Temple Aff. ¶ 15. In addition, when Sandoz attempted to gain approval of a three-way combination (essentially CPB without bellafoline), it argued that the combination was related to Cafergot. Temple Aff. ¶ 21.

Sandoz's argument that 21 C.F.R. § 310.6 is inapplicable to this case because it was adopted in 1972 and should not be applied retroactively to products marketed prior to its adoption is unpersuasive. There is apparently no case law to support this argument, and courts have repeatedly applied this provision to pre–1962 drugs. *See, e.g., Hynson*, 412 U.S. at 615 n. 7, 93 S.Ct. at 2476 n. 7; *SmithKline*, 587 F.2d at 1114–16 and n. 14 (finding a pre–1962 combination containing ingredients that are

"similar or related" to drugs to be "covered by" the NDAs of the named drugs).

Sandoz also argues that 21 C.F.R. § 310.6(b)(1) is not the properly applicable provision in this case because it relates only to "brands, potencies, dosage forms, salts and esters." Rather, Sandoz claims, CPB Suppository is a "combination drug" governed by § 310.6(b)(2). Sandoz asserts that drugs falling under this regulation are not considered to be "covered" by the NDA for another drug. However, Sandoz ignores the full text of § 310.6(b)(1). That subsection reads:

An identical, related, or similar drug includes other brands, potencies, dosage forms, salts, and esters of the same drug moiety *as well as of any drug moiety related in chemical structure or known pharmacological properties.*

§ 310.6(b)(1) (emphasis added). Sandoz's experts have acknowledged the relationship or similarity between CPB Suppository and Cafergot. *See, e.g.,* Dexter Aff. ¶¶ 6–7. Sandoz has also repeatedly stated that the effectiveness of CPB Suppository is caused by the effectiveness of the ingredients in Cafergot Suppository. *See, e.g.,* Sandoz Memorandum in Opposition to Motion for Summary Judgment at 22 n. 17 ("It is indisputable, of course, that the effectiveness of CPB Suppository for treatment of headache pain is dependent on the action of the active ingredients of Cafergot Suppository."). (citations omitted). Thus, it is evident that § 310.6(b)(1) applies in the instant case to CPB Suppository.

Finally, Sandoz's attempts to distinguish and evade the consequences of the Supreme Court's holding in *USV* are unpersuasive. Sandoz suggests that *USV* should be read to hold that § 310.6(b)(i) applies only to identical "me-too" or "generic" drugs such as those at issue in *USV*. If Sandoz's argument were correct, however, the words "similar" and "related" in the regulation would be redundant and unnecessary. The court finds that, as common sense suggests, the words "similar" and "related" are intended to add something to the scope of the regulation and to extend its reach to include certain drugs that are not identical. CPB Suppository constitutes such a drug.

Sandoz also seeks to distinguish *USV* on the policy ground that the drugs at issue in that case had not been shown to be effective, but that Cafergot and CPB Suppository have been. Thus, Sandoz argues, a broad reading of "covered by" is not necessary or appropriate in this case to effectuate the purposes of the FDA Act. This contention is unavailing for several reasons. First, as described earlier, CPB Suppository may not be properly deemed generally recognized as safe and effective. Moreover, in *USV* the Supreme Court recognized that its construction of the 1962 grandfather clause subjected *all* post–1938 prescription drugs to the effectiveness requirements of the Act. 412 U.S. at 665–66, 93 S.Ct. at 2505–06. The Supreme Court adopted that construction to avoid creating a loophole where "manufacturers can go on marketing drugs previously subject to new drug regulation without demonstrating by the new statutory standards that they were effective as claimed." *Id.,* 412 U.S. at 666, 93 S.Ct. at 2506. Thus, the Supreme Court has rejected the creation of the sort of "loophole" Sandoz advocates in this case.

### III. *Conclusion*

In view of the foregoing, Sandoz has not borne its burden of showing that CPB Suppository is protected by the grandfather clause of the 1962 amendments. Rather, the evidence requires a finding that it is not. In addition, the United States has shown it is entitled to summary judgment on its claim that CPB Suppository is a "new drug" which may not be sold without FDA approval. Thus, it will be the responsibility of the FDA, rather than this court, to determine whether CPB Suppository is safe and effective.

### IV. *Order*

Accordingly, the United States' Motion for Summary Judgment is hereby ALLOWED. The United States shall by September 19, 1989, consult claimant and then

submit to the court a proposed order to effectuate this decision.